[No. G008570. Fourth Dist., Div. Three. Dec. 29, 1992.]

In re the Marriage of CHERYL A. and GEORGE CHICK IVERSON.
CHERYL A. IVERSON, Appellant, v.
GEORGE CHICK IVERSON, Respondent.

**COUNSEL**

Marjorie G. Fuller for Appellant.

E. Robert Lemkin, De Goff & Sherman and Richard Sherman for Respondent.

## OPINION

**SILLS, P. J.**—Cheryl Iverson appeals from a judgment dissolving her marriage of 15 years to George Chick Iverson. Primarily she challenges the trial court's finding that a premarital agreement signed by the parties was valid. She also challenges the granting of a protective order limiting discovery and the interpretation of the agreement. Chick cross-appeals from a portion of the judgment directing him to maintain a $1 million life insurance policy in favor of Cheryl.

The oral statement of decision of the judge who presided over the trial of the validity of the premarital agreement—and who acted as trier of fact in that proceeding—is so replete with gender bias that we are forced to conclude Cheryl could not have received a fair trial. Accordingly, we must reverse and direct the matter be retried before a different judge. All other issues follow in the wake of this determination.

I

Cheryl and Chick separated in April 1987. Shortly thereafter, Cheryl filed this action to dissolve the marriage.

Chick obtained an order to bifurcate the proceeding and try the validity of a premarital agreement each had signed. During the trial, Chick testified he did not want to get married, told Cheryl he did not want to get married, and made it clear to his associates he was perfectly happy not getting married.

Cheryl told a somewhat different story. Chick first brought up the subject of marriage. He asked her to marry him in front of the late actor John Wayne, just after Chick had asked Wayne to be his best man. Marriage was the reason she moved in with Chick. He told her he wanted the couple to live together and be married.

The testimony also differed on the circumstances surrounding Cheryl's signing of the agreement. Chick presented the testimony of Rita Cruikshank, wife of the late William Cruikshank, Chick's attorney. She testified that in June 1972, Cheryl and Chick met on her husband's boat. William Cruikshank read the agreement to them. He asked if they understood what he was reading to them. They answered yes. This happened several times while he

was reading the agreement. After he finished, he turned to Cheryl and told her, "Cheryl, I think maybe it's advisable you see another attorney, make sure this is what you want to do." Cheryl said, "No, no, no. Whatever Chick wants." He then handed Cheryl a pen. She signed.

Cheryl testified she never discussed the contents of the agreement with an attorney before she signed it. Nor could she recall ever being advised by any attorney about her rights to property that might be acquired during her marriage to Chick. She had no recollection of ever signing the agreement (though she acknowledged signing it, because her name was on it).

After the testimony was finished, the trial judge noted there was "too much money" involved in the case "for it not to be appealed." He then said, "I want whoever reviews this to be able to have the benefit of my reasoning for how I get to where I got."[1] He then elaborated:

"One of the things that struck me, first of all, was that the petitioner in this case, Cheryl Iverson, only had five or six luncheon dates with Chick Iverson before she decided to move into his home. Now, he sure as heck does not look like John Wayne and he doesn't look like John Derek. And even if we take 17 years off him, I don't think he looks like Adonis.

"And, so, we have a situation in the beginning where we have a girl who has been testified to [sic] was lovely, and is lovely, but who did not have much of an education, and did not have much of a background in business, and did not have much by way of material wealth. Had nothing going for her except for her physical attractiveness. Who, somehow or other, comes to the attention of Mr. Iverson and, after five or six luncheon dates, is invited to move into his home.

"It seems to me that the process of marrying is one in which there is some mutual advantages from the act of getting married, maybe different ones from the act of establishing a relationship, a live-in type, spousal-type relationship.

"But, in light of the testimony that Mr. Iverson had come out of a very unpleasant, very unhappy marriage, his statement that he was reluctant to get married again adds some dimension here. 'Once burned, twice cautious.' He had just gone through a divorce which cost him a million dollars. He does not want to get in one of those things again. He has talked to his important friends in the film industry and other areas, where living together is the common situation rather than marriage. And, so, decides that's the best thing

---

[1] It is ironic that these very comments are precisely what mandates reversal in this case.

for him. He makes an offer to petitioner, who thinks it's good. And then she moves in.

"I cannot accept the fact that, as she said, he was the one that proposed marriage to her. That would be the last thing that would be on his mind. And why, in heaven's name, do you buy the cow when you get the milk free, as we used to say. And, so, he's getting the milk free. And Cheryl is living with him in his home.

"And the impetus for marriage must be coming from her side, because there's nothing Mr. Iverson is going to get out of it. Marriage is a drag on the market. It's a deprivation of his freedom. He's got everything that he would want out of a relationship with none of the obligations. Now, I am of the opinion that the impetus for the marriage in the home, prior to the incident of the birthday party for John Wayne, came almost entirely from the petitioner in this case, resisted by respondent."[2]

## II

▉ We quote the judge's statement at length to show that, in resolving disputed issues of fact, it is reasonably clear that he entertained preconceptions about the parties because of their gender. These perceptions appear to have made it impossible for Cheryl to receive a fair trial. (Cf. *Webber* v. *Webber* (1948) 33 Cal.2d 153 [199 P.2d 934] [trial court perceptions required reversal of decision to award no alimony or attorney fees]; see also *People* v. *Van Gorden* (1964) 226 Cal.App.2d 634, 638 [38 Cal.Rptr. 265] [appellate court may inspect reasons given by trial judge to determine how result was reached].)

In the first place, the statement that Cheryl was a "lovely girl" shows gender bias toward her as a witness. The judge did not use a similar description for Chick. The resolution of the credibility issues in the case thus may have been based, at root, on Cheryl's gender and physical attributes.[3] As the validity of the prenuptial issue depended on the resolution of conflicting testimony, this possibility contaminates the subsequent disposition of the case. The day is long past when appellate courts can disregard judicial

---

[2]This language, particularly the more egregious comments, was quoted extensively in Cheryl's opening brief to demonstrate that the judge injected his "own personal opinion of the parties conduct and appropriate reasons for marriage" into his decisionmaking. We think these quotations, combined with related references in the opening brief to the trial judge's "opinion," "antediluvian philosophy," and "view toward marriage," adequately raise the issue of gender bias.

[3]See Report of the Judicial Council Advisory Committee on Gender Bias in the Courts (1990), tab 2—Introduction, at page 3: "The advisory committee's working definition of

action rooted in racial or sexual bias as harmless error (see *Powers* v. *Ohio* (1991) 499 U.S. __, __ [113 L.Ed.2d 411, 428, 111 S.Ct. 1364] [importance of eliminating racial discrimination from "official acts" within the judicial system]).

Additionally, use of the word "lovely" reveals gender bias. While the word is usually complimentary, in context here it was used in juxtaposition to "education," "background in business," and "material wealth," to indicate Cheryl's limited credibility as a witness. There is thus more than a faint whiff of " 'romantic paternalism' " in the choice of the word. (See *Frontiero* v. *Richardson* (1973) 411 U.S. 677, 684 [36 L.Ed.2d 583, 590, 93 S.Ct. 1764] [traditionally, sex discrimination "was rationalized by an attitude of 'romantic paternalism' which, in practical effect, put women, not on a pedestal, but in a cage"].)

Furthermore, it cannot be gainsaid that, whatever the judge's actual gender bias, the description of Cheryl—a woman in her 40's—as a "girl" seriously detracts from the *appearance* of justice. Our Supreme Court has directed that " '[t]he trial of a case should not only be fair in fact, but it should also appear to be fair.' " (*Webber* v. *Webber, supra,* 33 Cal.2d at p. 155, quoting *Pratt* v. *Pratt* (1903) 141 Cal. 247, 252 [74 P. 742].)

Besides the use of language indicating gender bias, the judge also appears to have employed gender-based stereotypes in his decisionmaking process. (See *Frontiero* v. *Richardson, supra,* 411 U.S. at p. 685 [36 L.Ed.2d at p. 591] [reference to "gross, stereotyped distinctions between the sexes"].) His reasoning appears to have been that "lovely" women are the ones who ask wealthy men who do not look like "Adonis" to marry, and therefore Cheryl was not credible when she testified Chick asked her to marry him. The error here is the application of a generality to specific individuals. (2) It is the essence of our system of justice that individuals shall be judged on their own merits, not on some characteristic they happen to share with other people. (See *Frontiero* v. *Richardson, supra,* 411 U.S. at p. 686 [36 L.Ed.2d at p. 592] ["the sex characteristic frequently bears no relation to ability to perform or contribute to society"].)

 Next, the reference to not buying the "cow" when the "milk is free" cannot be countenanced. There is, in the reference, an obvious double standard based on stereotypical sex roles. (Both Chick and Cheryl were

---

gender bias is: behavior or decision making of participants in the justice system that is based on or reveals (1) stereotypical attitudes about the nature and roles of women and men . . . ."

See also Preliminary Report of the Ninth Circuit Gender Bias Task Force (1992) at page 17: "Gender affects litigants in a variety of ways. One problem relates to women's credibility as witnesses . . . ."

living together, but only Chick was seen as benefitting from the relationship, simply because he was a man.) And we hardly need elaborate that in the context in which it was used, the reference was plainly demeaning to Cheryl, analogizing her to a cow. Again we find a "predetermined disposition" to rule against her based on her status as a woman. (See *Webber* v. *Webber, supra,* 33 Cal.2d at p. 158.)

In *Webber,* a trial judge indicated he had prejudged a request for alimony arising out of a 36-year marriage when, three times in rapid succession, he described the testimony regarding the claim as the washing of "dirty linen." (See 33 Cal.2d at pp. 156-157.) Our Supreme Court said this conduct indicated an "unsympathetic attitude toward the litigation" that did "not accord with recognized principles of judicial decorum consistent with the presentation of a case in an atmosphere of fairness and impartiality," and could not, therefore, "be condoned." (33 Cal.2d at p. 163.) And in *Pratt,* on which *Webber* relied, our Supreme Court said that where the trial of a case does not appear to be fair, "it shocks the judicial instinct to allow the judgment to stand." (141 Cal. at p. 252.)[4]

We follow *Webber* and *Pratt* and likewise decline to condone the gender bias revealed in the statement of decision here.[5] Moreover, even if we say the judge in this matter harbored no direct bias against Cheryl as an *individual,*[6] his statements still, like those in *Webber* and in *Pratt,* do not accord with recognized principles of fairness. It goes without saying that the *appearance* of justice, required by *Webber* and *Pratt,* is clearly absent.

---

[4]In *Pratt,* a wife sued her husband for an accounting of his management of certain of her property. He sought to put the couple's 17-year-old daughter on the stand to testify about the husband's receipt of the rents. The judge then told the husband's counsel he was sinking to the lowest "depth of infamy" to put the couple's child on the stand, and nothing "would condemn [his] client" in the judge's eyes more than that. (141 Cal. at p. 250.) The Supreme Court, on appeal, characterized the judge's statements as a threat to "prejudge" the husband's own testimony unless the daughter was withdrawn as a witness. (141 Cal. at p. 251.) Such a prejudging of the case was so contrary to the *appearance* of fairness that the Supreme Court simply could not allow the judgment to stand. (141 Cal. at p. 252.)

[5]We respectfully part company with the suggestion made by our concurring colleague that the judge's comments showing gender bias were taken out of context. These comments were central to, and part and parcel of, his *statement of decision.* The "lovely girl" statement was part of weighing the parties' respective credibility as to why they got married in the first place, a question which must necessarily be the core of any resolution of the validity of a premarital contract inextricably linked to that decision. Likewise, the "cow" comment was part of the judge's analysis of the difference between cohabitation and marriage, which affected his evaluation of the same central factual issue.

[6]At oral argument, Justice Moore asked Cheryl's counsel: "You're not charging the judge with bias are you?" In response, Cheryl's counsel opined that the judge was not "specifically biased against my client."

However, counsel then quickly drew a distinction between bias against Cheryl *individually* and bias against women *generally,* when she added: "But I do think he showed an attitude of bias toward women. And I don't think that this court has heard me before arguing gender bias

The gender bias evidenced in the resolution of the validity of the prenuptial contract contaminated not only that issue but the balance of the case which depended on it. The judgment is therefore reversed and remanded for a new trial on all issues. The Presiding Judge of the Orange County Superior Court is directed to assign the matter to a different judge. (Code Civ. Proc., § 187; see also *People* v. *Swanson* (1983) 140 Cal.App.3d 571, 575 [189 Cal.Rptr. 547].)

■ An additional issue, however, should be addressed for the benefit of the trial court on remand—the problem of who has the burden of proof on the validity of the prenuptial agreement. The parties devoted a considerable portion of their briefs to this issue and deserve an answer.

Under Evidence Code section 500, "[A] party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." This provision applies to family law proceedings. (Evid. Code, § 300; Cal. Rules of Court, rule 1207; *In re Marriage of Mehlmauer* (1976) 60 Cal.App.3d 104, 108 [131 Cal.Rptr. 325].)

Before enactment of the Uniform Premarital Agreement Act (UPAA) (Civ. Code, § 5300 et seq.), contracts between parties contemplating marriage that governed their property rights were generally considered to be valid. (Civ. Code, former §§ 5133-5134; *In re Marriage of Dawley* (1976) 17 Cal.3d 342, 349 [131 Cal.Rptr. 3, 551 P.2d 323].) Also, under general contract rules, the burden of establishing a particular contract is illegal is on the party claiming the illegality. (*Fellom* v. *Adams* (1969) 274 Cal.App.2d 855, 863 [79 Cal.Rptr. 633]; *Sweeney* v. *KANS, Inc.* (1966) 247 Cal.App.2d 475, 480 [55 Cal.Rptr. 673].) Although the parties' agreement is not covered by the UPAA (Civ. Code, § 5302), the act codified prior case law. The comment to section 6 of the act, enacted as Civil Code section 5315, states it "is framed in a manner to require the party who alleges that a premarital agreement is not enforceable to bear the burden of proof as to that allegation. . . ." (9B West's U.Laws Ann. (1987) U. Premarital Agreement Act, § 6, com., at p. 377.) We thus conclude the burden of proof is properly placed on the party attacking the validity of the agreement, here Cheryl.

Wallin, J., concurred.

**MOORE, J., Concurring.**—While I concur in the result, I do not join in the zeal of my colleagues in flogging the trial judge for actual bias. I disdain

in any case—and I've been up here a lot of times. But this particular case, it seems to scream out."

We agree with counsel that this is a case not of prejudice against an individual party for reasons which may be peculiar to that person, but rather of gender bias which taints the decisionmaking process itself.

bias of whatever kind. However, I do not agree that the trial court's comments read in context establish actual bias. I am supported in this position by Cheryl's own attorney who, at oral argument, admitted: "I'm not charging the judge with legal bias in terms of was he biased against my client."

Notwithstanding this concession, the majority pounce on the trial judge's comments during the trial's first phase, lift the remarks out of context, and reverse the judgment, concluding the remarks established the trial judge was biased in fact against Cheryl because of her gender. As I shall explain, the grounds employed by the majority are wholly unnecessary. It matters not whether there was actual bias, appearance of bias being sufficient to warrant reversal.

The majority focus on only the first part of the trial judge's comments explaining his ruling. To place the comments in their proper context, it is necessary to summarize his entire statement.

Initially, the trial judge found Cheryl was the first to raise the subject of marriage. He noted Cheryl was physically attractive and had a strong desire to improve her standard of living. Because of a recent bitter and financially expensive divorce from his first wife, Chick was reluctant to remarry. Thus, the court concluded Chick proposed to petitioner only after she expressed a willingness to give up any claim to his property. It is during this portion of the trial judge's oral statement that the comments forming the basis for this reversal occurred.

The trial judge then discussed Cheryl's credibility, noting her selective recollection of the material events. "What I am concerned about, however, is the quality of the petitioner's memory. She remembers with great detail the birthday party . . . for John Wayne, . . . things that were said in connection with that, but has no recollection about the . . . aspects of the relationship which would be detrimental to her. [¶] Now, that may be a conscious desire to deny the existence of unpleasant facts . . . . But I noted fairly early on, . . . that when she was being asked some questions by [respondent's counsel], she suddenly discovered she could remember better when he presented her with some examples of her prior testimony and prior acts . . . . She seemed to be admitting only what could be proved or could be established independent of this proceeding. [¶] Now, that has to throw into question just about everything else that she says. . . ."

After referring to the parties' wedding, the judge discussed their execution of the premarital agreement. He found Cheryl was not pressured to sign it,

Cruikshank reviewed the document in detail with the parties and advised them to have the document reviewed by independent counsel, but both parties declined to do so. The trial judge also concluded the testimony established Cheryl knew about the bulk of Chick's assets before signing the premarital agreement, and she did not enter into the agreement as a result of fraud, duress, coercion, or undue influence. The court subsequently prepared a written statement of decision.

Interestingly, the comments upon which we reverse the judgment related to a minor, if not insignificant, issue; which party first raised the subject of marriage. Since the parties concededly executed the premarital agreement and married, this question is, at best, of limited probative value. The evidence most likely would have been excluded if either party had made a proper and timely objection to it under Evidence Code section 352.

I do not agree the record establishes the judge who presided over the trial's first phase was biased in fact against Cheryl or women in general. In the remainder of his oral comments and in his written statement of decision the trial judge gave several legally justifiable reasons, which are supported in the record, for his decision finding the premarital agreement valid.[1] He ruled the burden of proving the invalidity of the agreement was on Cheryl. The majority and I agree he was correct. The majority's narrow focus on only one part of the trial judge's comments to find a way to inject gender bias is disquieting. Here, Cheryl did not initially claim gender bias. This claim first arose during oral argument on appeal. Under the majority's approach, a trial judge may well be reluctant to explain his or her reason for a ruling for fear the comments would later be taken out of context by a creative appellate court and used to reverse the decision without the trial judge having any opportunity to correct the problem or to explain or defend his or her action.

Nonetheless, I agree the trial judge's comments gave the appearance of a lack of impartiality. The Supreme Court has admonished that "The trial of a case should not only be fair in fact, but it should also appear to be fair. And where the contrary appears, it shocks the judicial instinct to allow the judgment to stand." (*Pratt* v. *Pratt* (1903) 141 Cal. 247, 252 [74 P. 742].)

This concept is also contained in Code of Civil Procedure section 170.1, subdivision (a)(6)(C). It states a judge "shall be disqualified" where for any reason "a person aware of the facts might reasonably entertain a doubt that

---

[1]For example, my examination of the record demonstrates any judgment invalidating the premarital agreement would not have been supported by substantial evidence. In other words, the evidence was legally insufficient.

the judge would be able to be impartial." Under Code of Civil Procedure former section 170, subdivision (a)(5), the prior statute governing disqualification of a judge for bias, a party had to establish bias in fact. (*Andrews* v. *Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 792-793 [171 Cal.Rptr. 590, 623 P.2d 151]; *United Farm Workers of America* v. *Superior Court* (1985) 170 Cal.App.3d 97, 103 [216 Cal.Rptr. 4].)

But the new statute altered that requirement. "The standard for disqualification provided for in subdivision (a)(6)(C) of section 170.1 is fundamentally an objective one. It represents a legislative judgment that due to the sensitivity of the question and inherent difficulties of proof as well as the importance of public confidence in the judicial system, the issue is not limited to the existence of an actual bias. Rather, if a reasonable man [or woman] would entertain doubts concerning the judge's impartiality, disqualification is mandated. 'To ensure that the proceedings appear to the public to be impartial and hence worthy of their confidence, the situation must be viewed through the eyes of the objective person.' [Citation.] . . . [¶] Various factors may impact on how the 'average person on the street' views a judge's participation in a case. One court has perceptively recognized that all other things being equal, the need for disqualification decreases by the extent to which the judge's rulings in the case are limited to purely legal matters. [Citation.] This is because a trial judge's factual findings are generally accorded considerable deference whereas legal rulings are subject to plenary appellate review. [Citation.] . . ." (*United Farm Workers of America* v. *Superior Court, supra*, 170 Cal.App.3d at pp. 104-105.)

The trial judge's comments in this case gave the appearance of his lack of impartiality. His characterization of Cheryl and his use of the cow metaphor were clearly inappropriate. The average person on the street could well entertain a doubt concerning whether the trial judge was impartial. Inasmuch as that is now the test, the judgment should be reversed.