Filed 2/14/20 (unmodified opn. attached)

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| TAMIKA SCHMIDT et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> SUPERIOR COURT, COUNTY OF VENTURA, <br><br> Defendant and Respondent. | B291385 <br> (Santa Barbara County <br> Super. Ct. No. VENCI00479100) <br><br> **ORDER MODIFYING THE OPINION AND DENYING THE PETITION FOR REHEARING** <br><br> **[No change in Judgment]** |

THE COURT:

The opinion herein, filed on January 22, 2020, is modified to show the correct counsel listing as follows:

Law Office of Christie E. Webb, Christie E. Webb; Law Office of Judith Williams and Judith K. Williams for Plaintiffs and Appellants.

There is no change in the judgment.

The petition for rehearing is denied.

_____

BIGELOW, P. J.          GRIMES, J.          WILEY, J.

Filed 1/22/20 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| TAMIKA SCHMIDT et al., | B291385 |
| Plaintiffs and Appellants, | (Santa Barbara County Super. Ct. No. VENCI00479100) |
| v. | |
| SUPERIOR COURT, COUNTY OF VENTURA, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Santa Barbara County, Thomas Anderle, Judge.  Affirmed.

Law Office of Christine E. Webb and Christine E. Webb; Law Office of Judith Williams and Judith K. Williams for Plaintiffs and Appellants.

Atkinson, Andelson, Loya, Ruud & Romo, Nate J. Kowalski, Jorge J. Luna, and Jennifer D. Cantrell for Defendant and Respondent.

Covington & Burling LLP, Gretchen Hoff Varner and Stefan Caris Love for The National Women's Law Center as Amicus Curiae on behalf of Plaintiffs and Appellants.

_____

Two court employees alleged a security guard named David Jacques sexually harassed them with his metal detecting wand during the courthouse entry screening process. All security screening was in public and on video. None of the video supported the allegations. After a lengthy bench trial, the trial court ruled the plaintiffs had not proved their allegations. The employees appeal, primarily targeting the trial court's decision not to credit testimony favorable to them. We affirm because substantial evidence supports the trial court's fact finding. The employees also unsuccessfully argue the judge was biased against them.

I

The evidence was conflicting and hotly contested. We view that evidence in a light favorable to the party that prevailed at trial, which was the Superior Court of California in the County of Ventura, which we shall call Ventura Superior Court. We resolve all conflicts in its favor. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 787.)

Plaintiffs Tamika Schmidt, a judicial secretary, and Danielle Penny, a Court Program Supervisor, worked in the Hall of Justice for Ventura Superior Court, which was the sole defendant. Schmidt and Penny complained about their treatment during the weapons screening at the building's entrance.

The County of Ventura retained a private company for security at county facilities, including the Hall of Justice. Court

2

employees, including Schmidt and Penny, had to pass through security screening when they entered the building.  Employees went through the same screening as the public but in a different line.

At peak hours, nine guards screened entrants at three stations in the Hall of Justice.  During the morning screening, typically ten to twelve people waited in the employee line.  On busy days, there were over one hundred in the general public line.

This slow and intrusive security process could annoy employees.  The trial court found "basically people hate screening" because it is inherently intrusive and because long term employees questioned why they had to endure it.  Long term employees can perceive screening as a sign of distrust.

During screening, people put belongings on a conveyor belt feeding into an x-ray machine.  Guards looked for prohibited items like guns, knives, scissors, and brass knuckles.  Over the years, this process has detected and intercepted weapons.

After putting items on the belt, entrants walked through a metal detector called an archway that beeped when it detected metal.  At least five levels of lights on the interior edge of the archway could light up to show where metal might be — that is, a shoe-level light showed if there was metal at the shoe level, and so forth.

If the archway beeped, a guard tried to determine the reason, often with a handheld wand of the sort commonly used during security screenings.  The wand beeped near metal.

Depending on the light signal on the archway, guards customarily waved the wand outside of people's legs, across their waistbands and a foot or two below that, and over the area of

back pockets.  Guards were trained not to put the wand too close to people, but to work properly it had to be a foot or closer to the body.

Guards were to stop people for wanding if the archway beeped.  People were not supposed to walk past the guard and go to the conveyor belt "until they [were] properly wanded."  But some long-term employees ignored the beep and kept walking to get their belongings from the belt.  Sometimes, the archway's lighting was slow to react.  In these instances, guards sometimes had to move with people or had to wand them as they bent to collect items from the conveyor belt.

Court employees were to report issues with security screeners to the Court's Director of Facilities, Bruce Doenges, who would forward complaints to the county.  County personnel were then to work with the security company to resolve issues.

Jacques began working in the Hall of Justice as a security guard in 2006.  The trial evidence about his security work was sharply conflicting.

Some testimony about Jacques was positive.  One woman described him as more thorough than other guards and said that, after hundreds of times through security, she had never seen him act inappropriately.  A different witness said Jacques "took the time to actually wand me and scan me where the other guards just let me walk through."  "Some of the guards will do what they are supposed to do, that is, block access to the Court House until they determine it is safe for that person to enter the courthouse."  Others described Jacques as having a military demeanor and body posture, perhaps from his six years in the Marine Corps.

The trial court found Jacques to be "a credible witness."

The plaintiffs, however, were highly critical of Jacques. Penny testified Jacques often gave women a hard time, unnecessarily putting their bags through the conveyor belt and unnecessarily and inappropriately wanding women in the pelvic area when the archway did not beep or light up in that area. Schmidt testified Jacques would come at her with the wand in a sexual manner and would hold the wand in front of her breasts and buttocks. Others said Jacques was "weird" and a "creep" on a "power trip."

Penny and Schmidt alleged Jacques persistently treated them in inappropriate ways during security screening.

Penny alleged Jacques inappropriately scanned her many times. Her deposition testimony was Jacques held the wand over her breast, pelvis, and buttocks for at least three seconds at a time when the archway did not beep. She also testified she often saw Jacques do this to other women. She reported to Ventura Superior Court that, for three days in a row in March 2014, Jacques blocked her path when the archway did not beep, scanned her buttocks, and once scanned her breast and pelvis.

Schmidt alleged Jacques held the wand stationary for several seconds over her breasts and buttocks about 100 times between 2011 and 2014. Schmidt alleged that, on March 28, 2014, Jacques dumped and searched her bag, took out her sewing kit, and refused to let her enter the building with sewing scissors. Video of the incident shows Schmidt was stopped for about one minute and she handed the sewing kit to Jacques.

That day, Schmidt emailed Doenges about Jacques and said she was "inappropriately scanned" and her belongings were "overscrutinized." The recipients of the email did not interpret this to be a complaint of sexual harassment.

5

Schmidt alleged that, on August 14, 2014, Jacques leaned over the x-ray machine, got close to her face, and yelled "Hi, Tamika. Good morning, Tamika. Have an awesome day." Silent video produced at trial shows Schmidt walk through security, collect her belongings, and walk away without Jacques leaning forward or getting close to her face.

Schmidt requested and had a meeting that day with the director of human resources, Lorraine Benavides. Schmidt said Jacques was taunting her when he greeted her by name. Benavides launched an investigation and, the following day, the county told her it would ask the private security company to reassign Jacques from the security screening line. Jacques was removed from security screening. But the county reviewed video and did not believe Jacques acted inappropriately, so he was moved to evening shift escort duty, still within the Hall of Justice.

Another human resource employee, Bernedette Terry, asked Penny and Schmidt about the dates of their interactions with Jacques so Terry could review video. Terry and others studied more than two weeks of videos.

The video did not support the plaintiffs. Penny alleged Jacques inappropriately wanded her three days in a row in March 2014, and Terry searched for but could not find footage matching Penny's account. On those dates, Jacques was either not working at all, was assigned to the x-ray machine rather than wanding, or was wanding but did not interact with Penny. Terry looked at video "a couple of weeks before and a couple of weeks after" the dates Penny provided but she still could not find video matching Penny's allegation.

There were other inconsistencies between the plaintiffs' claims and the video record. Terry identified two videos of Jacques and Schmidt. One was the incident in which Schmidt alleged Jacques took her sewing kit and would not let her enter the building with sewing scissors. The second was from August 14, 2014, when Schmidt alleged Jacques got close to her face and called her by name. Neither video matched Schmidt's claims. The first showed Schmidt handing Jacques the sewing kit, not him dumping her bag or taking the kit from her bag. The second did not show Jacques leaning forward or getting close to Schmidt's face, as Schmidt had alleged.

Schmidt and Penny filed suit against defendant Ventura Superior Court on March 9, 2016. In the operative second amended complaint, they alleged 1) hostile work environment sexual harassment in violation of the Fair Employment and Housing Act, Government Code section 12940(j); 2) failure to take remedial action in response to complaints in violation of Government Code sections 12940(j) & (k); and 3) retaliation.

During the discovery process, Ventura Superior Court produced videos of the screening process. Schmidt and Penny note the existence or lack of existence of videos "was the subject of much trial testimony." They do not mention or challenge any specific discovery rulings about Ventura Superior Court's production of videos.

The parties waived jury. At oral argument, plaintiffs' counsel said the nature of the Santa Barbara jury pool factored into this decision. The trial began in the Superior Court for the County of Santa Barbara on February 7, 2018 and lasted 19 days. There were 32 witnesses, including Schmidt, Penny, Jacques, three other security employees at the Hall of Justice, two

7

Ventura Superior Court Human Resources employees, over a dozen other Ventura Superior Court employees, a manager employed by the county, two union employees, and four experts.

The designation "me too" has connoted evidence of harassment or discrimination experienced by employees other than a plaintiff. (*Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 99 (*Pantoja*).) The *Pantoja* decision, the parties here in their briefing, and amicus curiae The National Women's Law Center in this case all have adopted this usage. We follow their lead.

Four women me-too witnesses testified about Jacques in support of Schmidt and Penny. These witnesses were Melanie Miles, Rochelle McKinnon, Hellmi McIntyre, and Erin Patterson. The court admitted this me-too evidence, sometimes over opposition from defendant Ventura Superior Court. For example, the defense moved in limine to exclude testimony from me-too witness Miles. The court denied this motion and admitted this me-too testimony about Jacques.

In addition to the four me-too witnesses, four other witnesses, including security supervisor Rollen Burns, provided what Schmidt and Penny claim was "[s]upporting 'Me Too' witness testimony."

The "supporting" me-too evidence from these four other witnesses was mixed. Burns, for instance, testified Jacques was overly zealous in conducting his job in many ways that differed from the way Burns did things. Jacques, according to Burns, would seem to go out of his way to examine people's personal effects. At times Burns would be called over to monitor the situation and to allow the person to continue into the building. Burns said Jacques' behavior could be offensive to some people, primarily women, and that Jacques sometimes did get too close

8

when he would wand a person. Burns announced that he was concerned Jacques subjected women to above-normal scrutiny. After years of working with Jacques, Burns came to this realization about Jacques's different treatment of women "this morning as he was testifying to this court today."

Burns had personal conflicts with Jacques over many issues, "most importantly," according to Burns, religious differences. Burns testified Jacques was a "dickhead," a "pain in the ass," and "I didn't care for the man."

The trial court disregarded Burns's testimony because his description of video evidence was "clearly incorrect" and because Burns's personal dislike of Jacques colored Burns's testimony. Burns "obviously did not like Jacques and he certainly did not like his religious views; he commented about them at least twice during his testimony."

Of the three other witnesses who provided "supporting" me-too evidence, two worked security with Jacques for several years and never saw him inappropriately wand women. The other witness oversaw the county's contract with the private security agency, reviewed video of Jacques, and saw no inappropriate conduct.

Penny and Schimdt testified to habitual and public misconduct by Jacques that many witnesses never observed, either in person or on the video that captured all interactions at the courthouse entrance.

Ronald Rojo, former Security Post Commander at the Hall of Justice, worked with Jacques for many years and never saw him inappropriately wand women. Rojo reviewed video evidence of Jacques, including video of Jacques and Schmidt, and saw nothing inappropriate.

Drew DeLaine worked security with Jacques for several years and never saw him scan women inappropriately.

Bruce Doenges, Ventura Superior Court Director of Facilities, observed Jacques interact with entrants to the Hall of Justice hundreds of times and never saw him sexually harass anyone.

Denise Gooding, Court Program Supervisor at Ventura Superior Court, saw Jacques almost daily. She went through screening with him hundreds of times and was never inappropriately wanded. Nor did she see Jacques inappropriately wand other women.

Keri Griffith, Senior Program Manager working at the Hall of Justice between 2012 and 2014, never saw Jacques inappropriately wand anyone.

Brenda McCormick, Deputy Executive Officer and General Counsel for the Ventura Superior Court, observed eight to ten hours of video that showed security guards, including Jacques, screening hundreds of people. McCormick testified Jacques's wanding was consistent, appropriate, inoffensive, and nondiscriminatory.

Schmidt and Penny showed no video evidence of Jacques using the wand to scan them.

The defense played a video of me-too witness McIntyre from July 17, 2014. Schmidt and Penny identify this as video exhibit 155-11. Plaintiffs' exhibit 155 has several videos on it. The pertinent video is the 11th one, at time marker 4:11 to 4:31. According to Schmidt and Penny, this is the same as defense Exhibit 328. Unfortunately the compact disk in the record for Exhibit 328 does not play. Nonetheless, for convenience and

10

following the parties' and the trial court's usage, we refer to the video of July 17, 2014 as Exhibit 328.

Schmidt and Penny point to video Exhibit 328 as evidence of sexual harassment. McIntyre testified Exhibit 328 demonstrated she was "sexually assaulted," "molested," and the conduct was "repulsive," "disgusting," and constituted sexual harassment. This same video was also played during Schmidt's testimony. Schmidt agreed Jacques's conduct in the video was "disgusting," "lewd," "a molestation," and "to some degree" a "sexual assault."

We have watched this July 17, 2014 video. It shows McIntyre walk through the archway and three levels of lights detect metal: two at the middle or upper body and one at the ground level. McIntyre does not stop as required but continues toward the conveyor belt. The guard — everyone agrees this is Jacques — approaches and swiftly moves the wand in front and back of McIntyre. The wand never hovers or touches her. The wand is in motion for two seconds.

An objective eye cannot detect what McIntyre and Schmidt said happened.

After the trial, the trial court gave the parties an 82-page statement of decision that reviewed the evidence, witness by witness. The decision gave individualized and detailed attention to witnesses, including all me-too witnesses and supporting me-too witnesses.

The trial court found Schmidt and Penny failed to prove sexual harassment by a preponderance of the evidence. Rather, the trial court found clear and convincing evidence there had been no sexual harassment. Schmidt and Penny alleged Jacques held the metal detecting wand over their breast, pelvis, or

11

buttocks for extended periods of time. The screening procedures are public and monitored by video, the trial court found, yet few witnesses saw the allegedly inappropriate wanding. The trial court also suggested that, if Jacques engaged in this conduct toward women, more women would have complained.

The trial court found the video evidence "clearly refutes" the plaintiffs' claims. The trial court pointed to the video, described above, of Jacques using the wand to screen me-too witness McIntyre. Schmidt and Penny argued this video demonstrated sexual harassment. But the trial court wrote "[a]ny reasonable person would not characterize" the episode as sexual harassment. The court found the evidence "clearly and persuasively showed" that the screening Schmidt and Penny complained of "was actually the normal screening procedure applied to everyone entering the courthouse," and that this procedure was not based on sex, and was not offensive under the "reasonable woman" standard under the circumstances of a courthouse with "reasonable heightened security precautions."

The trial court found Schmidt and Penny failed to prove Ventura Superior Court's responses to their complaints were unreasonable, untimely, or ineffective. It found Schmidt and Penny failed to prove the alleged retaliatory actions against them were "adverse employment actions" and therefore it ruled they did not prove retaliation.

The court entered judgment and filed a final statement of decision in favor of the Ventura Superior Court on May 7, 2018.

## II

We review the trial court's factfinding for substantial evidence. This traditional standard of review is highly deferential. It has three pillars. First, we accept all evidence

supporting the trial court's order. Second, we completely disregard contrary evidence. Third, we draw all reasonable inferences to affirm the trial court. These three pillars support the lintel: we do not reweigh the evidence. (See *Harley-Davidson, Inc. v. Franchise Tax Bd.* (2015) 237 Cal.App.4th 193, 213–214.) Under this standard of review, parties challenging a trial court's factfinding bear an "enormous burden . . . ." (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1071, citation omitted.)

If substantial evidence supports factual findings, those findings must not be disturbed on appeal. (*Phillippe v. Shapell Industries* (1987) 43 Cal.3d 1247, 1257.) Inferences favorable to appellants may create conflicts in the evidence, but that is of no consequence. (*Forte v. Nolfi* (1972) 25 Cal.App.3d 656, 667.) When a civil appeal challenges findings of fact, the appellate court's power begins and ends with a determination of whether there is any substantial evidence — contradicted or uncontradicted —to support the trial court findings. (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429.) We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.)

Our job is only to see if substantial evidence exists to support the verdict in favor of the prevailing party, not to determine whether substantial evidence might support the losing party's version of events. (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1245.)

Venerable precedent holds that, in a bench trial, the trial court is the "sole judge" of witness credibility. (*Davis v. Kahn* (1970) 7 Cal.App.3d 868, 874.) The trial judge may believe or

13

disbelieve uncontradicted witnesses if there is any rational ground for doing so. (*Ibid.*) The fact finder's determination of the veracity of a witness is final. (*People v. Bobeda* (1956) 143 Cal.App.2d 496, 500.) Credibility determinations thus are subject to extremely deferential review. (*La Jolla Casa de Manana v. Hopkins* (1950) 98 Cal.App.2d 339, 345–346 ["[A] trial judge has an inherent right to disregard the testimony of any witness . . . . The trial judge is the arbiter of the credibility of the witnesses"] (*La Jolla Casa*).)

Section 780 of the Evidence Code provides a convenient list of common factors bearing on the question of credibility. (See Evid. Code, § 780 and Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1966 ed.) foll. § 780, p. 280 [citing *La Jolla Casa*, *supra*, 98 Cal.App.2d at p. 346].)

These binding principles are traditional and sound. Fact finders see and hear witnesses. The finder of the facts has a view appellate courts lack. That view is better. (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 385 [appellate courts defer because trial courts are better positioned to evaluate evidence] (*Haworth*).) This appellate deference is longstanding. (E.g., *Gargia & Maggini Co. v. Sanfilippo* (1922) 56 Cal.App. 348, 351–352.)

Whether events did or did not happen is a question of fact. The trial court found the events Schmidt and Penny described did not happen. Schmidt and Penny vigorously disagree with this adverse factual finding, but their counsel are aware of the forbidding burden facing merely factual appeals. Schmidt and Penny thus attempt to recast their arguments as issues of law and not fact. To these arguments we turn.

14

## III

Schmidt and Penny contend the trial court committed legal error by failing in the statement of decision to apply and to cite three cases: *Pantoja, supra,* 198 Cal.App.4th 87; *Zetwick v. County of Yolo* (9th Cir. 2017) 850 F.3d 436 (*Zetwick*); and *Fuller v. Idaho Dept. of Corr.* (9th Cir. 2017) 865 F.3d 1154 (*Fuller*).

The trial court did not err. It properly applied the law, including *Pantoja, Zetwick,* and *Fuller.*

The trial court properly applied *Pantoja*'s holding. In *Pantoja,* the employer called women employees "bitch" and placed his hands on intimate parts of their bodies. (*Pantoja, supra,* 198 Cal.App.4th at p. 119.) The *Pantoja* trial court erroneously excluded me-too evidence: evidence of harassment or discrimination experienced by employees other than the plaintiff. (*Id.* at p. 99.) The *Pantoja* decision held that evidence was admissible. (*Id.* at pp. 109–119.)

In this case, the trial court properly admitted the evidence the *Pantoja* trial court had erroneously excluded. This trial court complied with *Pantoja.*

Turning to *Zetwick* and *Fuller,* these holdings did not control this trial court's bench trial evaluations because, among other reasons, *Zetwick* and *Fuller* were about summary judgments. A judge's function at summary judgment is only to decide if disputed issues of material fact make trial necessary; the judge neither weighs evidence nor assesses credibility. (E.g., *Zetwick, supra,* 850 F.3d at pp. 440–441.) At the trial stage, however, the fact finder must evaluate witness testimony and resolve disputed issues of fact, because the mission is to find the truth amidst conflicting claims. The trial court in this case properly used governing law to perform this factfinding role.

15

The trial court's decision was consistent with the holdings in *Zetwick* and *Fuller*.

In *Zetwick*, the county sheriff routinely greeted a subordinate officer named Zetwick with many unwelcome chest-to-breast hugs and with a kiss aimed at her lips. Knowing she had complained about it, the sheriff continued to treat her in this unwelcome way more than 100 times. Taking the evidence in the light favorable to the plaintiff, as required at the summary judgment stage, the sheriff shook hands with men but hugged women. (*Zetwick*, *supra*, 850 F.3d at pp. 438–440 & 446.) *Zetwick* held it was error for the trial court to rule 100+ hugs and the kiss were not actions severe or pervasive enough to create a hostile work environment. Therefore, the trial court erred by granting summary judgment against Zetwick. (*Id.* at pp. 442–446.)

The summary judgment posture meant the court had to view the evidence in Zetwick's favor, sans credibility determinations. (*Zetwick*, *supra*, 850 F.3d at p. 441.) In trial, however, a fact finder faced with conflicting evidence must decide whom to believe. That is the major point of trial: to determine truth. The trial court in this case properly performed this function. Its conduct was not afoul of *Zetwick*, even assuming this federal authority is binding on state trial courts, which it is not. (E.g., *National Grange of Order of Patrons of Husbandry v. California Guild* (2017) 17 Cal.App.5th 1130, 1155.)

(Schmidt and Penny correctly note California courts "frequently seek guidance" from federal sexual harassment opinions. [*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 278.] "Guidance" is correct. *Lyle* did not make federal cases controlling authority for California state trial

16

courts. [See also *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1051 (*Yanowitz*)].)

We turn now to *Fuller*, where a male employee repeatedly raped a female employee. The employer expressed his concern about the rapist's plight but not the victim's, effectively condoning rape and creating a hostile work environment as a matter of law. It thus was error for the trial court to grant summary judgment against the rape victim. (*Fuller, supra*, 865 F.3d at pp. 1163–1164.)

*Fuller* was procedurally identical to *Zetwick*. Both decisions were about summary judgment proceedings where familiar rules *barred* the trial court from weighing the evidence. By contrast, this bench trial *required* the trial court weigh the evidence.

Schmidt and Penny's arguments the trial court failed to apply governing law thus are mistaken.

Schmidt and Penny also fault the trial court for not expressly citing *Pantoja*, *Zetwick*, and *Fuller*, but courts need not cite every case parties mention. Code of Civil Procedure section 632 states the trial court "shall issue a statement of decision explaining the *factual and legal basis* for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial." (Italics added.) The trial court did that. Its analysis sufficed.

Schmidt and Penny also argue the trial court erred by failing to credit all their witnesses. We assess these arguments according to the substantial evidence standard of review. For each witness, substantial evidence supported the trial court's determinations.

17

The trial court faulted Schmidt's testimony for many substantial reasons. Chief among them was the conflict between the video evidence and Schmidt's claims.

Penny's testimony was plagued by "many material inconsistencies in her testimony that were pointed out on cross examination that present irreconcilable and serious problems for her theory of the case."

The trial court ruled Miles was not helpful because she was "not sure" about a crucial aspect of her testimony, which seemed largely driven by her opinion Jacques "was a creep, a jerk, on a power trip, and was weird . . . ."

McIntyre's testimony, the court wrote, was "irreconcilable with what any reasonable person would say [the video] showed . . . ."

The trial court found Erin Patterson's testimony was not helpful to Schmidt and Penny. Patterson recounted a single incident where she was bending over to pick up her items from the conveyor belt when she felt Jacques's wand touch her buttocks. Patterson did not know if this was intentional or by accident. Patterson was friends with Penny, Schmidt, and McIntyre. On different occasions, Patterson socialized at Penny's home. By contrast, she thought Jacques was a "creep." This witness said Jacques's wand touched her once, apparently when she had not paused to be wanded, and she did not know whether the touching was by accident. The trial court rated this partisan witness as insignificant. Substantial evidence supported this determination.

The trial court disregarded the testimony of Rochelle McKinnon because "even the plaintiffs' attorney saw the material inconsistencies in her direct and cross examination testimony;

18

they were important discrepancies; she was impeached." The trial transcript supports this evaluation.

Schmidt and Penny make more arguments about the weight of the evidence, but it is all along the same lines. The claims of legal error boil down to a request to reweigh evidence, which the standard of review forbids. The judge's ultimate findings control and cannot be overturned by showing the judge believed a witness who made a statement that does not support the findings. (*Sketchley v. Lipkin* (1950) 99 Cal.App.2d 849, 855.)

Schmidt and Penny contend the trial court mistakenly believed sexual harassment must be overtly sexual or coercive, but the statement of decision shows a proper understanding of the law. It stated Schmidt and Penny had to prove they were "subjected to unwanted harassing conduct because of [their] gender," but they failed to prove their treatment was "based on sex," "humiliating," or "generally offensive."

Schmidt and Penny argue the court failed to apply an "ambient and persistent analysis" of the alleged sexual harassment and cite evidence in their favor tending to show harassment. We cannot accept this further invitation to reweigh evidence.

At oral argument, Schmidt and Penny disclaimed the argument a trial court should or must believe all me-too witnesses as a categorical matter. This suggestion would be contrary to precedent, for fact finders must evaluate every witness with an appraising eye, regardless of status or station. (Evid. Code, § 780; CACI No. 107.)

The friend of the court National Women's Law Center submitted a brief that synthesized "the current social science and law of sex harassment in order to describe for the Court the

19

realities of women's experience of sex harassment in the workplace."

We understand sexual harassment is prevalent, takes many forms, and need not involve coercion or unwanted sexual attention. We further agree reporting sexual harassment can be difficult and there is no single reasonable response to sexual harassment. For many reasons, harassment victims may delay or refrain from reporting harassment. The costs of reporting can outweigh the benefits.

Yet the brief offers no assistance in deciding whether the judgment is supported by substantial evidence. The Center's points are consistent with our conclusion that the standard of review compels us to affirm the judgment.

IV

Schmidt argues it was legal error for the trial court to find Ventura Superior Court took appropriate and timely remedial steps without determining when Ventura Superior Court knew or should have known about Jacques's harassing conduct. An employer cannot be liable for failing to take corrective action if the underlying claim fails. (*Dickson v. Burke Williams Inc.* (2015) 234 Cal.App.4th 1307, 1314–1317.) Schmidt and Penny concede this point. Because substantial evidence supports the finding there was no hostile environment sexual harassment, it was unnecessary for the trial court to make findings about when Ventura Superior Court knew about non-harassing conduct.

V

Schmidt and Penny contend the trial court was required to make legal and factual findings about Ventura Superior Court's alleged adverse actions. They say the trial court, without making these findings, erred by determining there was no retaliation.

20

This argument fails because the trial court in fact did make the findings they complain are omitted.

To prove a prima facie case of retaliation under the Fair Employment and Housing Act, plaintiffs must show 1) they engaged in a "protected activity," 2) the employer subjected the employee to an adverse employment action, and 3) there was a causal link between the protected activity and the employer's action. (*Yanowitz*, *supra*, 36 Cal.4th at p. 1042.) Typically, bringing a complaint under this statute is a protected activity, even if a court finds the challenged conduct did not violate the act. (*Id.* at p. 1043.) To constitute an adverse employment action, an employer's action must materially affect the terms, conditions, or privileges of employment. (*Id.* at p. 1051.) A court need not decide whether each alleged retaliatory act constitutes an adverse employment action in and of itself; courts consider the alleged actions collectively. (*Id.* at p. 1055.)

Schmidt and Penny say the trial court "appears" to predicate its finding they failed to prove retaliation on an unstated finding that the alleged conduct did not constitute actionable adverse employment actions. In other words, Schmidt and Penny submit the trial court found against them on the second prong of the prima facie case but object that the trial court did not state this finding.

The trial court, however, did state this finding.

The court's findings were:

"Penny *did not prove* her allegations of a poor review, low scores on her management position application, hyper scrutiny, false accusation of sexual harassment, and transfers from one department to the other *comprised adverse employment actions*

21

for her; she proved no retaliatory action was taken by [Ventura Superior Court]." (Italics added.)

"Schmidt *did not prove* the efforts to transfer her from her current position, accusations that she was not doing her job, interference with her approved intermittent FMLA leave, and refusal to allow her to have her union representative present for a potential disciplinary action, *comprised adverse employment actions* for her; she proved no retaliatory action was taken by [Ventura Superior Court]." (Italics added.)

Schmidt and Penny argue the trial court needed to "examine whether the employment actions collectively amounted to 'adverse employment actions.'" While the trial court did not use the words "collectively" or "totality," its analysis shows it considered the actions collectively. It listed all of the alleged actions and said the listed conduct did not comprise adverse employment actions. In the statement of decision, the trial court cited *Yanowitz*, the case Schmidt and Penny argue it failed to apply. The statement of decision describes each of the alleged retaliatory actions within its summaries of Schmidt's and Penny's testimony. There was no error, because the trial court considered the alleged retaliatory actions in their totality, as Schmidt and Penny claim it should have done.

VI

Schmidt and Penny point to several aspects of the trial court's decision and conduct as evidence of gender bias warranting reversal under the due process clause of the Constitution.

This federal constitutional challenge is not based on California's substantial state statutory system for dealing with alleged judicial bias, which requires those concerned about

22

judicial bias to file in the trial court and, if dissatisfied, to petition for writ of mandate, which is the exclusive means of review. (See *People v. Freeman* (2010) 47 Cal.4th 993, 999–1000 (*Freeman*).)

Schmidt and Penny never tried to invoke this state statutory protection against bias. They did the opposite: they waived their right to a jury trial, thus expressing their confidence in the judge. They concede the trial judge "was courteous and did say the trial involved an important subject. For the most part, his procedural rulings were fair." They note an attorney for the Judicial Council was in the courtroom observing the litigation. Schmidt and Penny say they cannot argue substantively about evidentiary rulings, "because offers of proof were not made . . . ." Our independent review shows many of the trial court's evidentiary rulings on objections to Penny's testimony, for instance, were extremely lenient and in her favor.

Only when Schmidt and Penny received the adverse results at the end of the trial process did they protest the trial judge's supposed bias against them. As a result, their only avenue for their bias argument is the due process clause, which sets an exceptionally stringent standard. (See *Freeman*, *supra*, 47 Cal.4th at pp. 999–1006.)

Schmidt and Penny have not shown a constitutional risk of actual bias or prejudgment requiring disqualification. (See *Freeman*, *supra*, 47 Cal.4th at p. 1006 & fn. 4; *Haworth*, *supra*, 50 Cal.4th at pp. 388–392.)

It is "extraordinary" for an appellate court to find judicial bias amounting to a due process violation. (*Freeman*, *supra*, 47 Cal.4th at p. 1006.) The appellate court's role is not to examine whether the trial judge's behavior left something to be desired, or

whether some comments would have been better left unsaid, but to determine whether the judge's behavior was so prejudicial it denied the party a fair, as opposed to a perfect, trial. (*People v. Snow* (2003) 30 Cal.4th 43, 78.) Mere expressions of opinion, based on observation of the witnesses and evidence, do not demonstrate judicial bias. (*Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 786.) Numerous and continuous rulings against a party are not grounds for a finding of bias. (*Andrews v. Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 795–796.)

A constitutional finding of judicial gender bias is appropriate only when "extreme facts" demonstrate a probability of actual bias. (*Freeman*, *supra*, 47 Cal.4th at p. 1006.) Appellate courts consider whether it is reasonably clear the trial judge entertained preconceptions about the parties because of their gender that made it impossible for a party to receive a fair trial. (*In re Marriage of Iverson* (1992) 11 Cal.App.4th 1495, 1499 (*Iverson*), disapproved on another ground in *Freeman*, *supra*, 47 Cal.4th at p. 1006, fn. 4.) This review is independent.

An appellate court found trial court gender bias warranting reversal in *Catchpole v. Brannon* (1995) 36 Cal.App.4th 237, 249 (*Catchpole*), a case about sexual harassment and assault. (Disapproved on another ground in *Freeman*, *supra*, 47 Cal.4th at p. 1006, fn. 4.) The appellate court focused on two aspects of the trial court's conduct: 1) the court's repeated expression of hostility and impatience toward the case, and 2) its invocation of sexual stereotypes in evaluating the female plaintiff's credibility. (*Ibid.*)

First, the trial judge in *Catchpole* repeatedly expressed disdain for sexual harassment cases and demonstrated impatience throughout the eight-day trial. (*Catchpole, supra,* 36

24

Cal.App.4th at pp. 243, 253.) The judge referred to the case as "all of this nonsense" and asked why the plaintiff took up the court's time with a case that "could only be detrimental to everyone concerned . . . ." (*Id.* at pp. 253, 258.) The trial judge subjected the plaintiff to a "lengthy interrogation" and "intimidating admonitions." (*Id.* at pp. 249–252 [asked if plaintiff understood these were "very serious allegations" and warned "your testimony is going to be looked at very carefully"].) This conduct "differed markedly" from how the judge treated other witnesses. (*Id.* at p. 249.)

Second, the trial court in *Catchpole* invoked sexual stereotypes to discredit the plaintiff, both through questions to the plaintiff and in the statement of decision. The judge "assumed" a father might blame his daughter for being sexually assaulted and asked the plaintiff if she brought the case because of her father. (*Catchpole, supra,* 36 Cal.App.4th at p. 250.) The judge repeatedly implied the woman was at fault for not preventing the sexual assault. (*Id.* at pp. 255, 257, 258 ["Why didn't you leave, then?"; "[d]id you ever consider just leaving without your clothes?"; "did you blame yourself for letting this happen?"; "[i]t is clearly inconsistent that she was offended, shocked and embarrassed by [the accused's] conduct and yet chose to remain, alone, after work, with him while he completed his work. One could infer that the plaintiff sought the attention of [the accused]."].)

An appellate court similarly found trial court gender bias in *Iverson, supra,* 11 Cal.App.4th at page 1497, because the trial court used sexual stereotypes in its decision making. The case was about the validity of a premarital agreement. (*Ibid.*) The trial court found the wife was not credible when she said the

25

husband initiated their marriage.  (*Id.* at p. 1499.)  To make that determination, the judge relied on the following:  the woman "[h]ad nothing going for her except for her physical attractiveness," and the woman had moved in before marriage, so "why . . . buy the cow when you get the milk free."  (*Id.* at pp. 1498–1499.)

The Supreme Court in *Freeman* disapproved of some language in *Catchpole* and *Iverson*.  That language had suggested a due process showing required something less than the standard the *Freeman* decision established.  (See *Freeman*, *supra*, 47 Cal.4th at p. 1006, fn. 4.)

The appellants in *Iverson* and *Catchpole* demonstrated ample evidence of extreme facts showing gender bias.  It was impossible for those women to receive a fair trial.  That is not so here.

We treat each of Schmidt and Penny's claims of supposedly extreme facts in turn.

1.  Schmidt and Penny contend the court did not analyze their claims under the correct legal framework, which shows judicial bias.

The trial court did not err in its treatment of *Pantoja*, *Zetwick*, and *Fuller*, as we have explained.  This was not bias.

Schmidt and Penny criticize the trial court's citation to three cases "taken verbatim" from Ventura Superior Court's trial brief.  These cases are *Johnson v. Tower Air, Inc.* (E.D.N.Y. 1993) 149 F.R.D. 461; *Morris v. Oldham County Fiscal Court* (6th Cir. 2000) 201 F.3d 784; and *Succar v. Dade County School Bd.* (11th Cir. 2000) 229 F.3d 1343 (*Succar*).  These three cases and notes about them indeed were in Ventura Superior Court's trial brief.  The court was clear, however, that the legal authorities listed

26

were not exhaustive. Moreover, it is proper to use cases and language from a party's trial briefs. Parties write briefs to help the court. The parties hope judges find their briefing useful and quotable. It is not bias for a brief to help a judge.

Schmidt and Penny say citation to *Succar* was offensive. That case involved conduct after a consensual relationship. A male employee sued his employer after a female coworker verbally and physically harassed him. (*Succar, supra*, 229 F.3d at p. 1344.) The court in *Succar* said the female employee's harassment of the male employee was motivated by her contempt of him after their failed relationship and was not motivated by his gender. (*Id.* at p. 1345.) Schmidt and Penny are correct the facts are not the same as their case. In this case there was no suggestion of intimate relationships. But that is not why Ventura Superior Court and the trial court cited the case. Their point was to suggest there was no actionable "sexual" harassment if Jacques's allegedly harassing conduct was not "because of" gender, as it was not in *Succar* and as it must be to constitute sexual harassment.

Citation of these precedents did not constitute bias.

2. Schmidt and Penny challenge the trial court's credibility determinations as biased.

Unlike the trial courts in *Catchpole* and *Iverson*, this trial court evaluated witnesses on proper and conventional grounds. Credibility determinations were unavoidable in this trial. Witness conflicts made it essential for the court to decide which side had better historians. The great problem for Schmidt and Penny was the video evidence, which contradicted their claims. The trial court's credibility determinations did not show bias.

27

Schmidt and Penny also say the trial court's decision to accept Jacques as a credible witness shows bias. This is incorrect. Finding a witness believable does not demonstrate bias. It demonstrates judgment.

3. Schmidt and Penny challenge the "treatment" of video evidence, which is a challenge to the inferences the court made at trial from videos — and the absence of videos.

Ventura Superior Court reviewed weeks' worth of video and did not find tape matching Penny's account of Jacques inappropriately scanning her three days in a row. Several witnesses testified to their efforts to find tapes of Schmidt and Penny. Schmidt and Penny claim one of the videos of Jacques wanding a witness shows sexual harassment, yet Jacques does not hold the wand stationary over her body in the way they allege. It was not bias for the court to infer from the lack of video evidence the alleged repeated harassing conduct did not happen.

4. Schmidt and Penny challenge allegedly improper rulings on hearsay objections in their reply brief.

These reply arguments are forfeited as tardy, because appellants must give the other side fair notice and an opportunity to respond. (See *People v. Rangel* (2016) 62 Cal.4th 1192, 1218–1219.)

5. Schmidt and Penny challenge the court's statement after accidentally using "Mr." instead of "Ms." in referring to a new witness. The trial judge said, "I apologize profusely. Don't send a letter to the Judicial Performance Commission, please."

Schmidt and Penny say this comment "appears to make fun of the Plaintiffs' case and gender discrimination in general." A more reasonable interpretation is the judge made an

28

embarrassing error and blurted out an apology. This was not bias.

6. Schmidt and Penny argue, without explanation, that the judge showed bias by using the title "Miss" to refer to all female witnesses and counsel.

Schmidt and Penny do not explain their logic here. We assume the point is using "Ms." would have been more appropriate. Ventura Superior Court notes (and Schmidt and Penny concede) plaintiffs' counsel introduced her clients as "Miss" on the first day of trial. Schmidt's and Penny's opening brief quotes their own counsel referring to "Miss Penny" during closing argument. Schmidt's and Penny's counsel introduced her paralegal as "Miss Sheena Workman." Using "Miss" under these circumstances was not judicial gender bias.

7. Schmidt and Penny suggest the trial court's omission of Danielle Penny's first name from the statement of decision section title for her testimony constituted bias.

The trial court used Penny's full name in the first page of the decision. The trial court wrote it would use last names throughout the opinion for ease of writing: "no disrespect should be assumed; none is intended . . . ." While the trial court included first names in the section title for other witnesses, we have no reason to think the omission of Penny's first name was bias against Penny.

8. Without comment, Schmidt and Penny quote the trial judge's explanation of why he invited Judge David Long, a retired presiding judge of the Ventura Superior Court, to come forward from the back of the courtroom after the witnesses had finished for that day. The trial judge said he knew and respected Judge Long, who was in Santa Barbara to see Long's friend Chief

Justice Cantil-Sakauye speak. According to Schmidt's and Penny's closing argument, Laurie Jacques, married to David Jacques, was judicial secretary for, and friends with, Presiding Judge Long.

Schmidt and Penny offer no explanation why they include the lengthy quotation under the heading "Other Evidence of Bias -- Gender and Otherwise." The suggestion in their reply brief is the trial judge should have recused himself. The trial judge said he did not discuss the case with the retired judge. Schmidt and Penny chose not to file a challenge under section 170.1 of the Code of Civil Procedure. Because of their choice, no record was created to support a finding of actual bias. This event was not an extreme fact demonstrating a probability of actual bias. (*Freeman*, *supra*, 47 Cal.4th at p. 1006.)

There is no evidence of judicial bias against the plaintiffs or their counsel. The trial court was not hostile, but instead amiable, toward Schmidt, Penny, their counsel, and their witnesses. The trial court described Schmidt as "gracious" and "kind," and Penny as "articulate" as well as "impressive" in her work at the court. The court wrote it "really liked" Penny and "liked [Schmidt] very much." Both women were "sincere." The trial court said it was impressed with the preparation, attention to detail, and professional work of counsel on both sides of the case. It complimented Schmidt and Penny's counsel for thorough and "well-prepared" cross examination and their "comprehensive" closing argument. The court ruled in Penny's favor on the issue of exhaustion of administrative remedies at trial and in both plaintiffs' favor at the demurrer and summary judgment stages. The court was courteous to the plaintiffs' witnesses.

Our colleagues in Division Four recently underlined how

30

important it is for every judge to combat gender bias in the justice system.  (*Briganti v. Chow* (2019) 42 Cal.App.5th 504, 511–512.)  We agree.  Our agreement is consistent with our holding that there was no constitutional violation in this case.

VII

Schmidt and Penny make a final passing argument that the statement of decision was "ambiguous, flawed, [and] omits critical findings," warranting reversal.  Aside from a reference to the trial court's superfluous finding that any damages in the case would be speculative, there are no record citations to support this broad argument, which Schmidt and Penny thereby have forfeited.  (Cf. *Centex Homes v. St. Paul Fire & Marine Ins. Co.* (2018) 19 Cal.App.5th 789, 796–797 [reviewing courts may treat argument as forfeited when counsel fail to provide record citations supporting appellant's contentions].)

**DISPOSITION**

The judgment is affirmed.  Costs are awarded to Ventura Superior Court.


WILEY, J.

We concur:


BIGELOW, P. J.



GRIMES, J.


31