Filed 2/11/14  Marriage of Goodpaster CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of JEFFREY A. and CHERYL GOODPASTER.<br><br>JEFFREY A. GOODPASTER,<br><br>    Respondent,<br><br>        v.<br><br>CHERYL L. GOODPASTER,<br><br>    Appellant. | G047295<br><br>(Super. Ct. No. 10D003730)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, James L. Waltz, Judge.  Affirmed.

Merritt L. McKeon for Appellant.

Law Office of Ronald B. Funk and Ronald B. Funk for Respondent.

\*            \*            \*

On appeal from a marital dissolution judgment, Cheryl L. Goodpaster (wife) contends the court showed gender bias against her and refused to hear her testimony about her health. We affirm the judgment.

FACTS

In April 2010, Jeffrey A. Goodpaster (husband) petitioned for dissolution of marriage. Three months later, the parties agreed husband would pay wife $2,400 a month in spousal support.

That same month, in an ex parte order to show cause (OSC), wife requested a domestic violence prevention order against husband, seeking, inter alia, an order that husband move out of the family residence. Wife declared that husband verbally and psychologically abused her. Among other allegations of husband's domestic violence against her, wife described an incident involving laundry: "This last weekend on Sunday I was out of the residence for most of the day and I returned at approximately 8:30 p.m. The garage door was open and I decided I was going to do a load of wash. I put in a load of wash and then returned to the house. While inside the house in the hallway I was confronted by [husband]. I told him I had just put a load of wash in, and his response was, 'Oh, that's fucking great; I've been fucking washing?' I said 'I'm sorry, the washer and dryer were empty.' Later I went out to the garage and picked up my laundry and returned to the house; at that point [husband] confronted me in the hall, I had both my arms filled with laundered clothes. I got down to the end of the hall, [husband] turns off the light switch at the other end of the hall, leaving the hall dark. [husband] then comes up and stands right in front of me, in my face; *I went to flip the light switch back on and he whacked my hand to prevent me from turning on the light switch.*" Wife further declared that for years she had helplessly watched husband physically abuse their eldest son, Curtis.

2

Prior to receiving a copy of wife's declaration, husband filed a declaration opposing wife's OSC, as did Curtis Goodpaster, the parties' adult son. Curtis declared: "I love both of my parents and don't want to hurt either one of them. Having said that, and not being privy to any allegations coming from my mother, as my father has not received any paperwork with any allegations, I can only say, that my father has never been violent with my mother, or threatened her in any way whatsoever, even since the divorce papers have been filed. [¶] I go to the house at least once or twice per week, and my father is always very calm, and is always trying [to] mind his own business, wheras [*sic*] my mother is the one who is out of control, accusing my father as being the one out of control. Before I moved out of the house, about one year ago, it was always my father that was in control of himself, and never laid a hand on my mother, nor threaten her in any way. [¶] All my father wants to do, is live in peace, and tries to avoid my mother as much as possible."

After receiving a copy of wife's allegations, husband filed another declaration opposing wife's OSC, in which he challenged, inter alia, her description of the laundry incident: "Cheryl was gone all day long from the house, she returned home at approximately 8:30 p.m. She must have decided that this would be an opportunity for her to start an argument with me as she soon realized that I had been using the washer and dryer at that moment. She entered the house, and must have gathered something of her own to put in the washer as an excuse to use the washer at the same time as I was, hoping that would start a fight between us. In the meantime, I went to close the garage door for theft reasons. So, while I was elsewhere in the house, and also got the comforter from my room for washing, she came out of her room stating that the laundry is being used. I answered back, 'Yes, I know I'm doing my wash.' She then advised me that she had just filled the washer with her things. I was shocked that in what seemed a couple of minutes, she could put her things in the washer, so that I wouldn't be able to use it. She could tell that the dryer was running, and that someone else was using the washer & dryer

3

at that time. . . . I went about my business at that point, and I never touched her or confronted her in the hall as she claims. Her assertion that the hallway was dark, would make it difficult for me to slap her hand away from the light switch in the darkness."

Commissioner Thomas H. Schulte presided over the hearing on wife's OSC. Inter alia, wife testified that husband forced her to have sex with him at least 15 times, including once in December 2009 when she was wearing a hard collar after neck surgery.

Commissioner Schulte granted wife's request for a domestic violence restraining order against husband. Prior to announcing his ruling, however, he criticized current law, which authorizes a move-out order only on specific grounds such as domestic violence. Commissioner Shulte explained that the prior law would have allowed him to issue a move-out order simply by finding "that the degree of acrimony [or] emotional stress to the parties or the children" warrants such an order to "keep the peace." Commissioner Schulte queried: "Do we leave families who are in the [throes] of divorce, who are locking one another in and out of rooms, who are in constant debate [about] who is going to use the washing machine, who is going to pay the bills, to the point they don't even speak with one another except when they are arguing, as in this case[?] Do we leave them there until somebody gets hurt?" Noting that the standard of proof was "a mere preponderance of the evidence," Commissioner Schulte found true wife's allegations that husband had (1) confronted her about the washing machine and scared her by turning off the light, (2) prevented her from leaving his bedroom when he wanted to talk with her about getting a mediator instead of a lawyer and she refused, and, in a "close call" finding, (3) kept her from leaving the car (when they were arguing about the divorce after a marriage counseling session) by hitting the lock button whenever she tried to open the door.

In January 2011, after husband had lost his job, the parties entered into a stipulation and order, agreeing that husband would pay temporary spousal support of

4

$1,450 per month and the parties would sell the house and a motor home. In June 2011, husband sought a modification of spousal support because his unemployment award was $450 per week. Judge James L. Waltz suspended the temporary spousal support order and set the matter for trial.

Judge Waltz presided over the dissolution trial. Prior to the attorneys' closing statements, Judge Waltz announced and explained his tentative decision. With respect to Commissioner Schulte's domestic violence finding, Judge Waltz stated, "There are different grades, shades, quality and character to domestic violence and I think you have to understand the circumstances behind the so-called domestic violence and I endeavor to do so in this case. [¶] I thoroughly read the transcript [of] the proceeding before [Commissioner] Schulte, and while I do not have the authority to [undo] or relitigate that matter or set aside the findings, nor do I intend to, I view that the incident that supported Commissioner Schulte's finding was more the result of common couple aggression and appears to be the result of bilateral hostility situational in nature, and indeed Commissioner Schulte struggled with his ultimate finding and it was a very close call. [¶] That appeared clear to me upon reading the record and I believe that notwithstanding the finding Commissioner Schulte made, it is an overstatement to characterize Cheryl as a victim of domestic violence." Consequently, Judge Waltz afforded this factor very little weight in determining spousal support.

Judge Waltz further stated: "There was a lot of talk about [wife's] health issues and her current ability to work. . . . First of all, she does have the ability to work. To say otherwise cannot be reconciled with the record and to the extent she claims otherwise, she was not credible. She has an ability to work and to earn money, she has done so in the past and she is engaged [in] a lifestyle that is completely consistent with her ability to work."

With respect to all the Family Code section 4320 factors, Judge Waltz found, inter alia, that (1) husband had lost his job and had made good faith efforts to find

5

a job in a poor economy, (2) wife was mostly unemployed and had concentrated on domestic duties and child rearing during the marriage, (3) wife makes $400 a month by providing part-time support services to elderly and infirm persons, (4) the marital standard of living was lower middle class, (5) the marriage was of long duration, (6) the parties were both 50 years old and in relative good health, and (7) the domestic violence restraining order against husband should be afforded very little weight. Judge Waltz found husband had the ability to pay support because he was currently receiving $450 per week in unemployment benefits and around $1,300 per month in rental income from two rental properties that are his separate property, and because he was living with a partner (which reduced his expenses). Judge Waltz found that wife was sharing living expenses with her parents, thereby reducing her current financial needs. Judge Waltz found that wife gave exaggerated, "grossly nonresponsive, evasive and at times not truthful answers" during her testimony. He found husband's testimony to be "credible and forthright," and wife's to be "the opposite." In calculating spousal support, he considered wife's lack of "credibility and attempts to mislead the Court as one of the many factors in calculating a fair and reasonable support under all circumstances." Judge Waltz further found that wife's behavior had driven up attorney fees for both sides.

Judge Waltz ordered husband to pay wife $700 per month in spousal support, $750 for spousal support arrears, $4,838 for her medical expenses, and $8,000 for her attorney fees. Judge Waltz ordered wife to "work toward becoming fully employed and self-supporting within a reasonable period of time."

DISCUSSION

*The Court Exhibited No Appearance of Gender Bias*

Wife contends the trial court exhibited gender bias, which became apparent only at the end of the case. She concludes the judgment should be vacated.

6

Under the due process clause of the federal Constitution, "while a showing of actual bias is not required for judicial disqualification under the due process clause, neither is the mere appearance of bias sufficient. Instead, based on an objective assessment of the circumstances in the particular case, there must exist '"the probability of actual bias on the part of the judge or decision maker [that] is too high to be constitutionally tolerable."' [Citation.] Where only the appearance of bias is at issue, a litigant's recourse is to seek disqualification under state disqualification statutes: 'Because the codes of judicial conduct provide more protection than due process requires, most disputes over disqualification will be resolved without resort to the Constitution.'" (*People v. Freeman* (2010) 47 Cal.4th 993, 996.)

Under Code of Civil Procedure section 170.1, subdivision (a)(6)(A), a judge must be disqualified if "the judge believes there is a substantial doubt as to his or her capacity to be impartial" (*id*., subd. (ii)) or a "person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial" (*id*., subd. (iii)). For example, if a trial court, in resolving disputed issues of fact, harbors "preconceptions about the parties because of their gender," these perceptions may prevent one party from receiving a fair trial. (*In re Marriage of Iverson* (1992) 11 Cal.App.4th 1495, 1499, disapproved on another ground in *People v. Freeman*, *supra*, 47 Cal.4th at pp. 1006-1007, fn. 4.) On the other hand, "the mere fact a judicial officer rules against a party does not show bias." (*In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1328.) "[L]itigants and attorneys sometimes manifest their emotional pique at a decision by blaming the judge for being biased. This type of accusation appears more frequently in the family law arena than any other area of law. The accuser's description of the questioned decision is at best incomplete and at worst self-servingly inaccurate." (*Id.* at p. 1326.)

In wife's opening brief, she acknowledges that Commissioner Schulte, in finding that domestic violence occurred, did not base his decision on the alleged marital

7

rape. Nonetheless, wife devotes one-fourth of her opening brief (she did not file a reply) to the subject. She grounds her contention of judicial bias predominantly on the alleged marital rape, asserting that Judge Waltz "simply did not like the claim of marital rape or sexual abuse" and exhibited judicial bias "by re-weighing domestic violence evidence and making a mockery of [her] sexual abuse allegations in the proceedings, by saying [she] was not a 'victim' . . . ."

Our Supreme Court has not fully resolved the issue of the applicable standard of review for determinations involving the appearance of partiality in the context of judicial recusal. (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 383, fn. 8.) Under any standard of review, however, the record provides *no* support for wife's contention that Judge Waltz gave the appearance of gender bias. To the contrary, the record reflects Judge Waltz acted fairly and without bias to both parties.

*The Court Did Not Abuse Its Discretion with Its Evidentiary Ruling During Wife's Redirect Examination*

Wife contends the court curtailed her redirect testimony about "her diagnosis of interstitial cystitis and rectal bleeding, her residual neck pain, a hemorrhage she experienced, and her neck disability from an accident she had which required two surgeries." She contends her disabilities are "interstitial cystitis, rectal bleeding, anxiety, and neck pain."

On direct examination, wife testified about her health as follows. Her health "is not that good." She sees seven doctors. Currently she has lost 30 pounds, is bleeding from the rectum, has ulcerative colitis and diarrhea, and is "on four medications plus pain pills." She went to the emergency room the previous year due to "bleeding, dehydration and anemia, and just serious pain." Based on her health and symptoms, she would be unable to obtain and keep a job. In a 2005 car accident, she suffered "a disk pop out" and "effusion," and as a result, had surgery in 2007.

8

At no time did the court impede wife's direct examination testimony on her health. Indeed, the court invited wife to "describe the measure of [her] health." Husband's counsel lodged two objections to wife's answers, but the court overruled the objections.

On redirect examination, wife's counsel asked wife to identify her symptoms regarding her "medical issues." Wife testified, "I have two medical issues, conditions: I have interstitial cystitis —" Husband's counsel moved to strike the answer as nonresponsive. The court stated that wife's counsel asked "about the symptoms," that wife had already told the court about her symptoms, and that the court had "pages of notes on this." The court further stated, "We don't need to go over it."

"""The extent of the redirect examination of a witness is largely within the discretion of the trial court."""" (*People v. Hamilton* (2009) 45 Cal.4th 863, 921.) Here, the court's ruling was not an abuse of discretion. Wife had ample opportunity during direct examination to testify about her medical symptoms. On appeal, wife does not contend that during cross-examination, husband's counsel elicited any new information on the subject. (See *ibid.* [when witness is questioned on cross-examination on matters not elicited on direct examination, witness may be examined on redirect on the new matter].) The court afforded the parties every opportunity to make their cases in this three-day trial. It did not abuse its discretion concerning wife's redirect testimony.

*We Deny Husband's Motion for Sanctions*

Husband moves this court for sanctions against wife for filing a frivolous appeal, contending that gender bias is the only theory by which she seeks reversal and that there is absolutely no evidence of gender bias on the part of Judge Waltz. While it is true the record contains no evidence of gender bias harbored by the trial court, and although this is a very close call, the appeal also concerned an evidentiary ruling. We cannot say the appeal indisputably has no merit or was prosecuted for an improper

9

motive.  (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650.)  The motion for sanctions is denied.

DISPOSITION

The judgment is affirmed.  Motion for sanctions is denied.  Husband is entitled to his costs on appeal.

IKOLA, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


FYBEL, J.

10