Filed 1/14/25  Silva v. The Signature Motors CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SAMANTHA L. SILVA, | H051552 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 21CV390953) |
| v. | |
| THE SIGNATURE MOTORS LLC, | |
| Defendant and Appellant. | |

Over defendant The Signature Motors LLC's (Signature) objection, an arbitrator awarded plaintiff Samantha L. Silva almost $60,000 in attorney fees and costs.  The trial court confirmed the award.  Signature contends that the trial court was required to vacate the award because the arbitrator did not disclose his role on a webinar about arbitration of attorney fees and costs.  But the trial court correctly determined disclosure was not required, and Signature has not substantiated its assertion that the award itself reveals arbitral bias.  So we will affirm.

## I.    BACKGROUND

Silva sued Signature in state court about a used car purchase.  The trial court granted Signature's petition to compel arbitration and the parties commenced arbitration before the American Arbitration Association (AAA).

AAA ultimately appointed Jonathan Polland—who did not provide any disclosures, oath, or curriculum vitae—as arbitrator.  On the day of Polland's

appointment, defense counsel informed AAA that the parties had agreed to settle Silva's claims. The settlement rescinded a sales contract, required Signature and another defendant to pay Silva a total of $9,323.13, required Silva to return the car, and included provisions requiring defendants to comply with various statutes and regulations in the future.[1] The settlement did not resolve Silva's claim for attorney fees and costs. About a week after Polland's appointment, Signature notified Polland that the case was settled except for attorney fees and costs.

After briefing and a hearing, Polland awarded Silva $58,101.75 in attorney fees and $1,376.82 in costs. In his written award, Polland found that (a) the claimed billing rate of $595 per hour was reasonable; and (b) the hours claimed were excessive for two reasons: (1) counsel sought compensation for personally performing secretarial work; and (2) "[w]ith the exception of work performed drafting the initial demand letter and complaint, the case settled before a substantial amount of work was performed relating to the underlying merits of the case." To correct for the excess, Polland awarded Silva 90 percent of the $64,557.50 she claimed in fees.

Thirteen days later, AAA sent defense counsel an e-mail advertising a webinar scheduled for the next month. The e-mail's footer indicated that it was "a promotional e[-]mail from [AAA]" and provided a link for counsel to unsubscribe from AAA's communications.

The webinar was called "Everything an Advocate Needs to Know About Winning Attorney Fees and Costs in an Arbitration." AAA identified Polland and another faculty member who would discuss a handful of topics: (1) "How an arbitrator determines whether to award attorney fees and costs"; (2) "The basis for an attorney's fee and cost award - special issues in arbitration"; (3) "Factors arbitrators consider when determining

---

[1] America One Credit Acceptance, LLC was also a named defendant in the trial court and is a party to the settlement agreement. But Signature is the lone appellant.

the amount of attorney fees and costs"; (4) "Calculating pre- and post-award interest"; and (5) "Best practices for briefing these issues in arbitration and other practical tips." AAA advertised that its webinar "will help you better advance your client's interests in arbitration whether you are seeking or opposing fee and cost awards." Polland never disclosed his anticipated role in the webinar to the parties.

Back in state court, the parties filed cross-petitions to confirm or vacate the award. The trial court confirmed the award, rejecting Signature's assertion that Polland was required to disclose his role in the webinar. Signature timely appealed after entry of judgment.

## II.    DISCUSSION

### A.    *Standard of Review and Legal Principles*

"While arbitration awards are 'nearly immune' from attack, 'one of the limited grounds for challenge is bias on the part of the arbitrator.' " (*FCM Investments, LLC v. Grove Pham, LLC* (2023) 96 Cal.App.5th 545, 555 (*FCM Investments*).)  Like judges, arbitrators " 'should be disqualified if a person aware of the facts might reasonably entertain a doubt that the arbitrator would be able to be impartial.' " (*Ibid*.)  But in the arbitration context, "the test is whether a hypothetical reasonable person . . . [¶] . . . ' "could reasonably form a belief that an arbitrator was biased for or against a party for a particular reason." ' " (*Ibid*.; see also Code Civ. Proc., §§ 170.1, subd. (a)(6)(A)(iii) [requiring judicial disqualification where a person "might reasonably entertain a doubt that the judge would be able to be impartial"], 1281.9, subd. (a)(1) [applying § 170.1 to arbitrators]; *Wechsler v. Superior Court* (2014) 224 Cal.App.4th 384, 391 ["if a fully informed, reasonable member of the public would fairly entertain doubts that the judge is impartial, the judge should be disqualified"].)[2]  Subject to exceptions inapplicable here, an arbitration award shall be vacated if the "rights of the party were substantially

---

[2] Undesignated statutory references are to the Code of Civil Procedure.

prejudiced by misconduct of a neutral arbitrator" or the "arbitrator making the award . . . failed to disclose within the time required . . . a ground for disqualification of which the arbitrator was then aware." (§ 1286.2, subd. (a)(3), (6).)[3]

"The test is objective and fact-specific." (*FCM Investments*, *supra*, 96 Cal.App.5th at p. 555.) The party seeking to vacate the arbitration award "bear[s] the burden to establish a reasonable impression of possible bias." (*Ibid*.) We review the court's order de novo. (See *Haworth v. Superior Court* (2010) 50 Cal.4th 372, 383–388 (*Haworth*); see also *Perez v. Kaiser Foundation Health Plan, Inc.* (2023) 91 Cal.App.5th 645, 652.)

**B.** *Appearance of Bias*

Signature's main contention is that Polland was required to disclose his faculty role in the webinar because it was a ground for disqualification. Signature argues that the title's reference to "winning" fees and costs suggests that Polland has a bias in favor of fee claimants (in Signature's view largely plaintiffs). But neither the advertisement as a whole nor Polland's participation in the advertised webinar support a reasonable belief that he was biased for or against any party for a particular reason.

**1.** *Knowledge of the information to be disclosed*

To begin, Signature has not established the basic factual predicates that would be necessary to trigger disclosure—that Polland was aware before the conclusion of arbitration of his future involvement in the webinar or how the webinar would be advertised. Signature agrees that Polland's disclosure obligation continued until he issued the arbitration award, no longer. (See *Grabowski v. Kaiser Foundation Health Plan, Inc.* (2021) 64 Cal.App.5th 67, 77 [explaining that continuing duty of disclosure

---

[3] Section 1286.2, subdivision (a)(6) can also apply where the arbitrator "was subject to disqualification upon grounds specified in Section 1281.91 but failed upon receipt of timely demand to disqualify himself or herself." But section 1281.91 is not implicated here, because Signature did not demand Polland's disqualification at any time before the conclusion of the arbitration proceeding.

applies until the conclusion of the arbitration proceeding].) But AAA did not send its advertisement until 13 days after Polland issued the award. Nothing in the record establishes that Polland had agreed to be in the webinar prior to the issuance of the arbitration award. Nor does the record establish when, if ever, Polland became aware of AAA's advertising materials or the title AAA used in those materials.

Signature maintains that Polland "indisputably" (capitalization, italics & underscoring omitted) knew of the webinar at least 13 days before AAA sent the advertisement. Signature presumes that Polland was the organizing force behind the webinar and that it would have taken him more than 13 days to "f[i]nd a co-panelist, prepare[] an itinerary, secure[] a program date, and presumably s[eek] approval from [AAA]." But there is no evidence that it was Polland, rather than AAA, who performed these tasks. Signature's assertion that Polland was the driving force behind the webinar and related advertising is unsupported in the record.[4] Rather, the advertisement came from AAA, not Polland. Polland may have merely agreed to a request from AAA to serve as a panelist on a webinar providing practical advice about arbitration of attorney fee and cost disputes. On the record available to us, we can only speculate whether Polland became aware of AAA's webinar before issuing the arbitration award.

## 2. *Impression of bias for or against a party*

Even assuming Polland was aware of the advertisement before issuing the award, Polland's involvement in the advertised webinar does not invite a reasonable belief that

---

[4] Signature contends that Polland targeted its counsel for advertising knowing he had just granted a "maximalist" award against Signature. Even if a fee award 10 percent below the request qualifies as "maximalist," the e-mail on its face identifies AAA (at "information@adr.org") as its sender, Earl Hassel as the point of contact for the webinar, and itself as "a promotional e[-]mail" from AAA's "marketing communications preference center," communications from which the recipient may "unsubscribe." (Underscoring omitted.) In short, it was spam. There is no evidence that Polland sent the advertisement, targeted Signature's counsel, or had any involvement in AAA's marketing of the webinar.

he was biased for or against a party for a particular reason. As advertised, the webinar was a forum for Polland and another arbitrator to explain how an arbitrator decides whether and in what amount to award fees and costs, with practical tips to benefit practitioners whether "seeking or opposing fee and cost awards." Polland's participation in a neutral presentation of issues on the subject of fee and cost awards in arbitration does not support a reasonable impression of bias in favor of one side or the other.

We consider all the facts, not the title of the webinar in isolation. (See *Betz v. Pankow* (1995) 31 Cal.App.4th 1503, 1507.) We assume that teaching a course intended only to help those claiming attorney fees could support a reasonable impression of bias in favor of those claimants. But the content of the advertisement reflects that, however titled, AAA's webinar was intended to help "better advance your client's interests . . . *whether you are seeking or opposing* fee and cost awards." (Italics added.) The webinar, offered for a $75 fee, simply provided any interested practitioners insight that was intended to be useful for all attorneys claiming or defending fee and cost requests in arbitration.[5]

Signature emphasizes the significance to its counsel of "any sign of potential bias against vehicle dealers"—and its counsel's response to the advertisement— reasoning that fee requests are often the "tail that wags the dog" in the consumer protection disputes

---

[5] Signature's authorities do not involve analogous facts. (See *Catchpole v. Brannon* (1995) 36 Cal.App.4th 237, 262 [trial "court's remarks throughout trial show[ed] that its conception of . . . sexual harassment [was] based on stereotyped thinking about the nature and roles of women and myths and misconception about the economic and social realities of women's lives"]; *In re Marriage of Iverson* (1992) 11 Cal.App.4th 1495, 1497 [trial judge's oral statement of decision was "so replete with gender bias that [the court was] forced to conclude" woman in marital dissolution proceeding "could not have received a fair trial"]; see also *People v. Freeman* (2010) 47 Cal.4th 993, 1006, fn. 4 [explaining that *Catchpole* and *Iverson* should be understood as cases actual bias was shown "based on comments by the judges about women"]; *Haworth*, *supra*, 50 Cal.4th at p. 390 [assessing whether public censure reasonably indicated that judge could not be fair to female litigants].)

counsel defends. We appreciate the importance of both impartiality and the appearance of impartiality to Signature, its counsel, and the integrity of the arbitral system more generally. (See *FCM Investments*, *supra*, 96 Cal.App.5th at p. 555.) But " ' "[t]he partisan litigant emotionally involved in the controversy underlying the lawsuit is not the *disinterested objective observer* whose doubts concerning the judge's impartiality provide the governing standard." ' " (*Mt. Holyoke Homes, L.P. v. Jeffer Mangels Butler & Mitchell, LLP* (2013) 219 Cal.App.4th 1299, 1311.) The record here provides no reasonable basis to question Polland's impartiality.

### 3. *Financial interest in the subject matter of the arbitration*

Signature asserts that Polland has a financial interest in ruling on arbitral fee disputes to drive interest in his webinar, which the losing parties in particular would thereafter be incentivized to attend. (See § 170.1, subd. (a)(3)(A) [grounds for disqualification include a "financial interest in the subject matter in a proceeding or in a party to the proceeding"].) But Signature's assertion is speculative. The record does not disclose how, if at all, Polland was compensated for his role in the webinar. Nor does it support Signature's insinuation that Polland personally directed both the transmission of the advertisement to Signature's counsel and the timing of that e-mail on the heels of the fee award. And the logic of Signature's theory is infirm. We presume that any arbitration of a fee dispute—or any dispute—will leave at least one side dissatisfied. We decline to leap from there to the conclusion that one side's dissatisfaction generates the thirst for education that would supply an arbitrator a "financial interest in the subject matter in a proceeding." Certainly Signature's counsel do not attribute the arbitration award here to any deficiency of continuing legal education, only to bias. Taking at face value Signature's assertion that Polland's award in this case caused its counsel to "[become] interested in taking such a course," counsel stopped short of claiming that it did so—even to further investigate its claim of bias. Signature conflates the case-specific

7

"subject matter in a proceeding" (§ 170.1, subd. (a)(3)(A)) with the generic subject matter of instruction.[6]

### 4. *Personal interest in the subject of instruction*

Barring a financial interest in the subject matter of the proceeding, Signature argues that "the topic of attorney's fees is clearly of special interest" to Polland and should therefore have been disclosed. We do not share Signature's novel reading of the ethical standards. The mere existence of a "personal" interest—even a "special" or "specific" one—in an area of legal *practice* is not a matter for disclosure under the California Rules of Court, Ethics Standards for Neutral Arbitrators in Contractual Arbitration (Ethics Standards) and AAA Consumer Arbitration Rules (AAA Rules).[7] Although the term "specific interest[]" appears in a comment to standard 7, subdivision (d) of the Ethics Standards and "personal interest" appears in rule 18, subdivision (a)(3) of the AAA Rules, these terms are not used in the manner Signature adopts in its briefing: Signature conflates the ethical requirement of disinterest with the state of being uninterested. And we reject as unduly speculative Signature's assertion that Polland has "an implicit bias against those who . . . submit briefs which don't follow his teachings."

In sum, Signature has neither shown that the facts it relies on arose before the arbitration was complete nor established a reasonable impression of possible bias.

---

[6] Were we to accept Signature's argument, the practical effect would be a bar on arbitrators telling practitioners how they generally approach legal issues. This would not further the interest of providing transparency about the arbitral system, which Signature elsewhere invokes. Rather, it would prohibit one means by which arbitrators might otherwise assure the public that "the system of private justice that has taken over large portions of California law produces fair and just results from neutral decision makers." (*Honeycutt v. JPMorgan Chase Bank, N.A.* (2018) 25 Cal.App.5th 909, 931.)

[7] Signature's unopposed request for judicial notice of the Ethics Standards and AAA Rules is granted. (See *Espinoza v. Superior Court* (2022) 83 Cal.App.5th 761, 787, fn. 8.)

Signature has also not shown that there was any ground for disqualification for Polland to disclose.

## C.  *Actual Bias*

To bolster its arguments for a reasonable appearance of bias, Signature argues that Polland improperly awarded Silva the full amount she requested for an unsuccessful boilerplate opposition to Signature's motion to compel arbitration, totaling about $20,000.  This, in Signature's view, shows actual bias.  Not on this record.

While an arbitration award may raise an impression of possible arbitrator bias (*FCM Investments*, *supra*, 96 Cal.App.5th at p. 557), " ' "[w]e do not review the merits of the dispute, the sufficiency of the evidence, or the arbitrator's reasoning, nor may we correct or review an award because of an arbitrator's legal or factual error, even if it appears on the award's face" ' " (*Bacall v. Shumway* (2021) 61 Cal.App.5th 950, 961 (*Bacall*).  In *FCM Investments*, the Court of Appeal, reversing the trial court, addressed an arbitrator's decision to discredit a witness because she used an interpreter based on three findings that taken together were insufficient to demonstrate the witness did not need an interpreter in a commercial arbitration.  (*FCM Investments*, at p. 553.)  *FCM Investments* concluded that the arbitrator's decision on its face reflected " 'misconduct' " comprising "actions that create a reasonable impression of possible bias."  (*Ibid*.)  The misconduct lay not in the amount of the arbitrator's award but in her rationale—finding a crucial witness not credible because she testified through an interpreter.  (*Id.* at pp. 556–560.)

Here, Signature can point to nothing on the face of the arbitrator's decision that would likewise raise an impression of possible bias.  Polland refrains from any comment on the credibility of either counsel.  His award reflects that he considered "the number of hours reasonably expended multiplied by a reasonable hourly rate," "reviewed each entry in the invoices submitted by [Silva] in support of her attorney fee claim" (italics omitted) as well as Signature's "detailed comments and critiques of those legal bills."

9

Nor has Signature presented extrinsic evidence that would suggest the award was so unreasonable as to raise an impression of possible arbitrator bias.

To support its claim that Polland awarded $20,000 for an unsuccessful opposition, Signature relies on a facially inaccurate declaration its counsel filed in the trial court. There, counsel declared that Polland "awarded [Silva's counsel's] entire request for attorney's fees (approximately $20,000 . . .) [f]or his losing opposition." But Polland's rationale for reducing Silva's requested fees was that her counsel spent too much time on a case where little work was done on tasks related to the merits. Opposing a motion to compel arbitration is a task unrelated to the merits. So Signature is at best mistaken in its belief that Polland awarded the full amount Silva sought for her opposition to the motion to compel arbitration.

Nor does the record include any evidence or argument the parties submitted to the arbitrator or a record of the arbitration dispute in the trial court. So we cannot conclude that the arbitrator's decision suggests bias, even if Signature could demonstrate it was erroneous.[8]

Were we to accept Signature's showing, we would unsettle the bargained-for finality of arbitration awards. Even "the existence of an error of law apparent on the face of [an] award that causes substantial injustice does not provide grounds for judicial review." (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 33; see also *id.* at pp. 8–13,

_____

[8] Nowhere has Signature marshalled authority for its contention that this award was improperly based on excessive hours or on an unsuccessful motion. (Cf. *City of Los Angeles v. Metropolitan Water Dist. of Southern California* (2019) 42 Cal.App.5th 290, 307 ["There is no requirement that each motion or opposition be successful to be reasonable"].) And absent a record—of what issues Silva briefed in opposing Signature's motion to compel, what evidence she proffered, what arguments she made at the hearing, or why the trial court granted Signature's motion—Signature cannot substantiate its claim that Silva's opposition was nothing more than a "Pavlovian opposition to an arbitration demand or motion to compel arbitration" that should be discouraged on public policy grounds.

28.) Signature in effect asks us to infer Polland's bias from Signature's belief that the award was erroneous. Merely recasting its claim of error as a claim of bias does not permit Signature to evade the limits on judicial review that it specifically sought by its arbitration demand. (*Id*. at p. 33; see also *Bacall*, *supra*, 61 Cal.App.5th at p. 961.) And Signature would have us set an unworkably low bar. As support for its claim that the award itself reflected bias, defense counsel in the trial court represented that an unrelated arbitration pitting his firm against Silva's counsel produced a fee award of $40,000, roughly a quarter of the almost $160,000 sought. We decline to extrapolate from a sample of one unrelated matter what the arbitrator here should have awarded, let alone to infer bias from any difference.

Signature bore the burden to establish a reasonable impression of possible bias. (*FCM Investments*, *supra*, 96 Cal.App.5th at p. 555.) It did not carry that burden.

### III.   DISPOSITION

The judgment is affirmed. Silva is entitled to her costs on appeal.

11

_____

LIE, J.

WE CONCUR:

_____

BAMATTRE-MANOUKIAN, Acting P. J.

_____

GROVER, J.

*Silva v. The Signature Motors LLC*
H051552